**In re SENSITIVE CARE, INC., et al., Debtors.**

**Bankruptcy No. 399–31463–SAF–7.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

Aug. 30, 1999.

Wm. Chris Wolffarth, Johnson & Wolffarth, L.L.P., Dallas, TX, for Robert Milbank, Jr., Trustee.

Hal F. Morris, Assistant Attorney General, Office of the Attorney General, Bankruptcy & Collections Division, Austin, TX, for the Texas Department of Human Services.

Peter A. Winn, Assistant U.S. Attorney, United States Attorney's Office, Dallas, TX, for Health Care Financing Administration.

Jeffrey Cook, Sullivan, Parker & Cook, Dallas, TX, for William Ed Campbell and Don Miller, Trustees.

James F. Adams, Passman & Jones, P.C., Dallas, TX, for Sundance Rehab. Corp., Suncare Respiratory Services, Inc. and Sunsolution, Inc.

David F. Staber, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Dallas, TX, for Karan Associates, et al.

## ORDER

STEVEN A. FELSENTHAL,
Bankruptcy Judge.

Sensitive Care, Inc., or one of its subsidiaries, owned and operated several nursing homes in the State of Texas. On February 24, 1999, involuntary bankruptcy petitions had been filed against Sensitive Care and several subsidiaries and affiliates. The bankruptcy court entered orders for relief and directed that the cases be jointly administered.

Prior to the petitions, the United States and the State of Texas took several actions to protect public moneys while assuring the wellbeing and care of the nursing home residents. At the request of the State of Texas, a state court appointed trustees for several of the nursing homes. The United States and the State of Texas made funds available to the trustees to operate several of the homes. *See* "Outline of Pre–Bankruptcy Government Actions," attachment A.

With the entry of the orders for relief, Robert Milbank, the trustee for the jointly administered bankruptcy estates, moved the court to compel a turnover of funds held by the state court-appointed trustees. The State of Texas by its Department of Human Services moved the court to excuse the turnover requirement. The state also moved the court to lift the automatic stay to allow a set-off of funds held by the state. The state also filed a notice of intent to exercise a right of recoupment. With the state court-appointed trustees, the Texas Department of Human Services moved the court for authorization to pay the trustees' operating expenses.

The Chapter 7 trustee, the state and the United States then negotiated a compromise of these motions. *See* settlement agreement, filed July 1, 1999, document no. 148, pages 20–24 of the motion to approve the compromise and settlement, attachment B. The trustee filed a motion to approve the compromise pursuant to Bankruptcy Rule 9019. Several creditors objected to the settlement. The court conducted an evidentiary hearing on the motion to approve the settlement on July 21, 1999.

On July 21, 1999, the court granted the motion to approve the settlement by findings of fact and conclusions of law issued from the bench. *See* transcript of bench ruling, attachment C. The court entered an

order granting the motion on August 3, 1999. *See* court order, attachment D.

In its bench ruling, the court complimented the state and federal agencies for their cooperative and constructive approach to protecting the nursing home residents while addressing the financial concerns of the debtor as perceived by the agencies. In turn, the settlement with the trustee harmonized protection of residents and matters of public fisc with the rights and priorities of creditors under the Bankruptcy Code.

The court has presided over several significant cases involving nursing homes. From that perspective, the court concluded that the post-petition settlement among the trustee and the state and federal governments following the coordinated pre-petition efforts of the state and federal governments fairly balanced competing interests while protecting nursing home residents. This process may well serve as a useful precedent for future cases.

Accordingly, the court directs that this order be docketed in the records of this case.

**SO ORDERED.**

**"ATTACHMENT A"**

### OUTLINE OF PRE–BANKRUPTCY GOVERNMENT ACTIONS SENSITIVE CARE, INC.

On November 17, 1998, the Office of Inspector General of the Department of Health and Human Services ("HHS–OIG") completed an audit of intravenous (IV) services at 13 skilled nursing facilities which belonged to a chain operating as Sensitive Care Nursing Homes, Inc. ("Sensitive Care"). HHS–OIG's audit made a determination that Sensitive Care was paying substantially more for IV therapy services than prevailing rates, that the majority of IV services provided were not medically necessary, and that nursing services and IV equipment were being improperly claimed as ancillary expenses instead of routine expenses on Sensitive Care's Medi-

care cost reports. According to the preliminary audit results, as much as 80% of IV charges were improper, resulting in estimated Medicare overpayments of over $7 million. HHS–OIG also alleged that Sensitive Care management were aware that these charges were improper, but had refused to change the abusive billing pattern because it resulted in higher Medicare billing reimbursement. The audit report was transmitted to the local United States Attorney's Office (the "USAO"), to the Health Care Financing Administration ("HCFA") to Texas Department of Human Services ("TDHS") and the Texas Attorney General ("Texas AG").

After consultation between HHS–OIG auditors and TDHS personnel, it became clear to the authorities that, even without its billing improprieties, Sensitive Care was in precarious financial condition. Several large vendors had not been paid in months. In spite of the financial insolvency of the company, its owners continued to make dividend payments to themselves. Thus even before a suspension of Medicare payments (the usual administrative response to suspected fraud), it appeared to state and federal authorities that Sensitive Care was already in imminent danger of failing to meet its payroll, creating an immediate danger of jeopardy to its residents. The authorities made the determination that a suspension of Medicare payments to Sensitive Care would push the already financially troubled company over the edge. Accordingly, TDHS, HCFA, the USAO, the Texas AG and OIG–HHS developed and implemented the following approach to protect the residents from the financial insolvency of their nursing homes and to stop the fraudulent billing practices at the homes, without jeopardizing the quality care in the nursing facilities.

On Friday, January 22, 1999, HCFA directed Mutual of Omaha, the Medicare fiscal intermediary, to suspend Medicare payments to Sensitive Care without prior notice effective Monday, January 25, 1999.

On Monday, January 25, 1999, as the suspension went into effect, the Texas AG, on behalf of TDHS, filed a petition in Travis County State Court for the immediate appointment of state trustees to oversee the facilities citing as grounds the financial emergency at Sensitive Care. On Monday, January 25, 1999, TDHS in close conjunction with HCFA, implemented a plan to stabilize the facilities, including close monitoring of the facilities by State surveyors, contact with family members to assure them of the safety of the residents, and coordinated communications with the press and with concerned politicians. On Wednesday, January 27, 1999, Sensitive Care agreed to the appointment of the state trustees, and on the same day the state trustees opened a bank account in their own names and HCFA lifted the suspension. The Order of the Travis County State Court authorized funds to be made available to the state trustees from the state's emergency Medicaid trust fund to ensure the health and safety of the residents.

While the facilities were managed by the state trustees, HCFA and TDHS attempted to facilitate the transition to new management. Their plan was that if new owners could not be identified, the facilities would be closed and the residents moved to other identified facilities in an orderly fashion. Once in place, however, the state trustees learned that the financial situation at Sensitive Care was much worse than anyone could have predicted. Employee paychecks from two weeks prior to the suspension bounced, health and liability insurance had not been paid, and the company owed more than $14 million to its suppliers. Further, the trustees learned that Sensitive Care management had not implemented a program to bill under the Medicare Prospective Payment System, which was to have been in place by January 1, 1999. This meant that no mechanism was in place to bill Medicare, and no new Medicare funds would be coming into the facilities. Because of the tremendous expense of operating the facilities, the state's emergency Medicaid trust fund was soon exhausted and TDHS had to request additional funds from the Legislature.

In the mist of the crisis, TDHS requested financial assistance from HCFA. Although HCFA did not have an emergency discretionary fund, on February 26, 1999, HCFA informed TDHS that the trustees should request an accelerated payment from Mutual of Omaha based on the failure of Sensitive Care's management to implement the Prospective Payment System. On March 11, 1999, Mutual released a check in the amount of $1,097,973.10 to the state trustees as an extraordinary advance loan on future billings to ensure that funds were available for the operation of the homes and the care of the residents.

Lack of interest among potential buyers caused the state trustees to close three facilities in February 1999. Upon the closing of these facilities, lessors interested in preserving the usefulness of their buildings for nursing home purposes proposed new management companies for the facilities. On March 1 and 5, 1999, the responsibility for day to day operations at the 10 remaining facilities was transferred to the new management companies, which HCFA and TDHS approved on the condition that they completed appropriate federal and state licensing and certification requirements. As the formal licensing and certification process was completed, TDHS and the state trustees continued to monitor the operation of the nursing homes. Thus, the crisis abated.

Throughout the crisis, no serious quality of care issues arose. No injuries or deaths of nursing home residents occurred because of transfer trauma, and the relocation of residents was minimized and took place in a safe and orderly process.

### "ATTACHMENT B"

\* \* \*

applies to both core and non-core proceedings. *See In re ILCO,* 48 B.R. at 1020; *In re Lion Capital Group,* 48 B.R. 329, 332

(S.D.N.Y.1985); *In re White Motor Corp.,* 42 B.R. at 701; *see also In re X–Cel, Inc.,* 46 B.R. 202, 204 (N.D.Ill.1984), *rev'd on other grounds,* 776 F.2d 130 (7th Cir.1985) ("Core proceedings include most matters which are integral to the adjudication of the bankruptcy or were traditionally before the bankruptcy·courts."). The Chapter 7 Trustee takes a contrary position. Accordingly, litigation of these claims would not only be unduly expensive but would result in substantial delay to debtor's liquidation efforts.

## III.

## SETTLEMENT

The Settlement provides as follows:

30. The State Nursing Home Trustees shall transfer all funds in their possession to the

---

to refer to bankruptcy judges "any or all cases under Title 11 and any or all proceedings arising under Title 11 or arising in or related to a case under Title 11." An express limitation on the authority of district courts to refer matters to bankruptcy courts is contained in 28 U.S.C. § 157(d). That section provides:

The district court may withdraw in whole or in part, any case proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court *shall,* on timely motion of a party... withdraws proceeding **if the court determines that resolution of the proceeding requires consideration of both Title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce** 28 U.S.C. § 157(d) (1994) (emphasis added).

---

Chapter 7 Bankruptcy Trustee within 10 days of entry of an Order Approving this Motion to Compromise and Settle. The Order shall expressly recite that until DHS and TWC have received the sum of approximately $2,058,480 through recoupment, setoff and payments under this settlement, and until HCFA has been paid the sum of approximately $1,097,973.10 *all funds shall retain their original characteristics as if still in the hands of the State Nursing Home Trustees.* By way of example, but not by limitation, funds segregated by the State Nursing Home Trustees as trust funds, shall not lose their alleged trust fund characteristics simply by transfer to the bankruptcy estate.

31. The Chapter 7 Trustee shall make payment within 10 days of receipt of the monies from the State Nursing Home Trustees on ALL invoices for goods and services provided to State Nursing Home Trustees incurred on their watch as administrative expenses approved by the Court and attached to the Order approving the Compromise. The Order approving Compromise and Settlement shall contain provision for the State Nursing home trustees to seek additional bills to be paid as administrative expenses should late bills come in. The Chapter 7 Trustee reserves the right to object to the payment of any individual bill(s) as either being improperly characterized as an administrative claim (e.g., unreimbursed employee healthcare claim caused by lack of funding of Sensitive Care's self insurance plan) or due to lack of adequate accounting documentation.

32. Payment by the Chapter 7 Trustee within 10 days of receipt from the State Court Trustees to HCFA of the $1,097,-973.10.

33. Relief from stay shall be granted to DHS to allow setoff of $652,011 to DHS for repayment to Nursing Home Trust Fund, plus allowance of setoff of approximately $28,350 additionally owed to The Texas Work Force Commission, plus allow recoupment of $1,115,130 as supplemental payment/overpayment from DHS out of the sum of $1,795,491 currently held by DHS.

34. Balance of moneys owing to DHS of approximately $262,989 (which have been traced to payments to State Nursing Home Trustees by State Nursing Home Trust Fund) shall be paid by the Chapter 7 Trustee within 10 days of receipt to DHS for balance of its claim of $915,000 owing to Nursing Home Trust Fund (for total

payment under *this* settlement of approximately $2,058,480).

35. DHS and HCFA shall be allowed to file ANY additional claim(s) but agree voluntarily to subordinate such additional claims to:

(a) all allowed administrative claims awarded by court to Chapter 7 Trustee, his Attorneys, his accountants (and any other professionals retained by the trustee whose fees are allowed by the court as administrative priority),

(b) all allowed priority claims including unreimbursed health care claims of employees of Sensitive Care caused by lack of funding of Sensitive Care's self insurance plan costs,

(c) DHS and HCFA further agree to subordinate to distribution of the FIRST Eight–Hundred Thousand Dollars ($800,000) of allowed Unsecured Claims to *non insider*, (as defined under 11 U.S.C. § 101(31)), or *affiliated entities* of Sensitive Care,

(d) The Bankruptcy Trustee shall not be required to file cost reports with HCFA for 1998 and 1999. HCFA will not file a claim in the bankruptcy estate based solely upon the failure of the Bankruptcy Trustee to file such reports. Should the Bankruptcy Trustee file a claim for 1998 or 1999 Medicare monies, HCFA reserves the right to assert any defenses or claims of offset to such claims. HCFA reserves the right to file cost reports on behalf of the bankruptcy estate, should it choose to do so.

(e) The Bankruptcy Trustee *shall file* cost reports for 1998 and 1999 (partial) as required *by DHS* and shall fully cooperate with both DHS and HCFA in their audits.

36. The Bankruptcy Trustee and his counsel shall incur *no* personal liability for completion and filing of any cost reports on behalf of Sensitive Care.

37. DHS further agrees to subordinate from any funds it may actually be paid directly by the bankruptcy estate (and not pursuant to recoupment or setoff) the costs to the estate of compiling and filing Cost Reports at the sole election of DHS for years 1998 and the applicable portion of 1999.

38. Notwithstanding the foregoing subordination provisions, *as a material condition to this settlement,* nothing herein shall preclude or limit in any way DHS and/or HCFA from effectuating *recoupment* and/or seeking relief from stay to effectuate *setoff* from *any* future Medicaid/Medicare moneys that may subsequently be due to Sensitive Care (by way of example but not by limitation, should the pending CHOW application for Sensitive Care, Inc.'s' facilities be denied).

39. As a *further material condition* to this Compromise and Settlement, the Order approving this Compromise and Settlement Agreement shall specifically recite:

Due to the unique facts and circumstances present in this case, the position of the Department of Human Services and the Health Care Financing Administration in entering into this Compromise and Settlement Agreement shall expressly not be treated as precedential nor shall it ever be cited as precedential against the Department of Human Services or any agency(ies) of the State of Texas or against the Health Care Financing Administration.

WHEREFORE, the Chapter 7 Trustee, State Nursing Home Trustees, Health Care Financing . . .

\* \* \*

## "ATTACHMENT C"

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE: SENSITIVE CARE, INC. DEBTOR

BK. NO: 399–31463–SAF–7

TRANSCRIPT OF PROCEEDINGS

(Court's Ruling)

BE IT REMEMBERED, that on the 21st day of July, 1999, before the HONORABLE STEVEN FELSENTHAL, United States Bankruptcy Judge at Dallas, Texas, the above styled and numbered cause came on for hearing, and the following constitutes the transcript of such proceedings as hereinafter set forth:

\* \* \* \* \* \*

THE REPORTER: All rise.

THE COURT: Thank you. Please be seated.

The Court will give a bench ruling on the motion of the trustee to approve the compromise and settlement. That's actually a joint motion, but under the Bankruptcy Code, the Court addresses the fact that the trustee is asking for the relief under Bankruptcy Rule 9019. The approval of settlements by a Chapter 7 trustee are core matters over which this Court has jurisdiction to enter a final order. The Court is required to make findings of facts and conclusions of law. The Court may do so by a bench ruling, so the parties should understand that this bench ruling will constitute the Court's findings and conclusions.

Because I'm giving this bench ruling immediately following the hearing, I obviously haven't written it out. So I will reserve the right to revise or edit or supplement or clarify these findings if necessary.

I'm going to focus the findings and conclusions on the objections, and I'll say at the outset that the Karan objection has been effectively resolved. The parties to the settlement have resolved the question on funds after March 5, 1999. The Chapter 7 trustee has agreed with Karan that the limited objection to the motion to approve the compromise will be construed by the Court as an application for payment of either on administrative expense or as an expense that would be incurred in the ordinary course of business by the state court trustees. The application is contested by the Chapter 7 trustee. Under this settlement the application will be resolved by this Court on notice and hearing.

The settlement resolves four motions, a motion for a turnover and a corresponding motion to excuse turnover, a motion to lift the stay to permit setoff and a motion for administrative expenses. There has also been a notice regarding recoupment which is resolved by this settlement as well.

The Bankruptcy Court may approve a settlement if it is in the best interest of the bankruptcy estate and if it is fair and equitable. The fair and equitable standard originally comes from the 5th Circuit's decision in the Aweco case which was a Chapter 11 case that basically stands for the proposition that fair and equitable are terms of art under Chapter 11 as they relate to the priorities established in Chapter 11. We're in Chapter 7 here, so the fair equitable standard should relate to the priorities in Chapter 7 which means, in effect, that the settlements have to be consistent with the priorities of the Bankruptcy Code unless agreed to by the parties at each level of priority. The 5th Circuit also recognizes that the Court must take care if approving a settlement over the objection of a creditor. To determine if these standards are met, the Court has to look at the probability of success in litigation with due consideration for the uncertainty in fact and law. The Court has to look at the complexity and likely duration of the litigation with any intended expenses, inconvenience and delay, and the Court has to consider all other factors that would bear upon the exercise of the Court's discretion to approve a settlement.

The Court will find and conclude that this settlement is in the best interest of the estate and is fair and equitable, and the Court will grant the motion to approve the compromise and overrule the remaining objection by the Sun Entities to the compromise.

The property of the estate issues are difficult and would take some time to litigate even though Section 541 is very broad. And it's probably fair for the Court to start its analysis with an assumption that because Section 541 is very broad, the trustee has a leg up coming in. The state and federal governments, however, are protected under the Bankruptcy Code in the exercise of the police powers, particularly here in the state, which has the immediate responsibility for the health and well-being of the citizens of the state. And the Bankruptcy Code excludes actions taken by the state pursuant to the police power from the reach of the automatic stay of the Bankruptcy Code. Case law also recognizes that funds subject to recoupment are not property of the bankruptcy estate. And while it may be a timing issue, lift stay motions to permit setoff are often granted.

With this settlement, the operating expenses incurred by the state court trustees would be paid. The state court trustees would then be in a position to seek discharges from the state court that appointed them. As testified by Dr. Ferris and confirmed by Mr. Miller, even if you questioned, as Mr. Adams did in his closing argument, how HCFA decided to suspend payments, HCFA in the exercise of its discretion made that decision but then coordinated with the State of Texas to make sure that that decision did not affect the patients of the Sensitive Care facilities. And that resulted in the petition in the state court that resulted in the appointment of the state court trustees and permitted the state court trustees to either close or take over the operations of the nursing homes, in return for which HCFA lifted the suspension and started delivering funds again permitting services to be provide to the patients.

There really is no conflict with the Bankruptcy Code. The state court trustees are custodians, and the Bankruptcy Code recognizes under Section 503 and Section 543 that the expenses they incurred in the ordinary course of their operations get paid by order of the Bankruptcy Code. That in turn assures that the exercise of the police power by the state is honored in the bankruptcy case. So here we have via the exercise of the police power state court trustees appointed by a state court. The bankruptcy case is subsequently filed. The state court trustees hold funds. The turnover of the funds would naturally occur. Everything would come into the bankruptcy case. But the Bankruptcy Code assures that the state court custodian, here the trustees are protected and the expenses that they incurred are paid thereby honoring the activities taken by the state court pursuant to the police power. It seems to me it's all harmonized and this settlement preserves that harmony. The settlement, therefore, permits the state court trustees to complete their work and allows for an orderly transition to the bankruptcy case. The settlement also permits for recoupment and the setoff for the State of Texas, and it permits the recovery of the $1.1 million that occurred during the gap period of time between the filings of the involuntary petitions and the order for relief under Chapter 7.

Sun contends that the settlement is premature. The evidence establishes, however, that it's timely. The state court trustees are holding funds. The State of Texas is holding funds. Funds have been segregated. There are ripe disputes of whether we have property of the estate involved. The state court trustees need to wrap up their activities. The Bankruptcy Code provides for turnover of funds held by custodians and for payment of operating expenses incurred by custodians. All of that is ripe for resolution.

Sun also contends that the settlement is too vague. The federal government and the state government and the Chapter 7 trustee have preserved certain issues. It's appropriate that they do so. Not all issues in the bankruptcy case have to be resolved when four motions are settled. Several of

those issues will involve very difficult cost-benefit analysis. I suspect the trustee will be consulting with the creditor body concerning how to perform that cost-benefit analysis, and indeed as the hearing revealed, Sun's position as a creditor is implicated in some of the issues that would be triggered by the filing of certain operating reports and certain actions that HCFA might take; and, therefore, how all that's done is going to have to be analyzed with some consideration by all the parties involved. And it's appropriate for the settlement to preserve those issues and put that analysis off for another day.

Likewise, it's appropriate to recognize that all the expenses that were incurred between January 27 and either March 1 or March 5 may not be known yet or there may be questions about them. So it's appropriate that there's a mechanism preserved for the trustee to get those resolved.

It strikes me that the best argument Sun has is that there's too little for the estate. This argument contends that this settlement is not in the best interest of the unsecured creditors. The Court must assess the complexity of the litigation and the length of time it would take to resolve the litigation and whether the settlement falls within a range of reasonableness. If we look at this at the unsecured creditor level, if the trustee lost completely, there is a scenario that there would be no funds available for distribution to unsecured creditors. So one range of litigating is that the unsecured creditors get nothing, the trustee spends the $160,000 that the trustee currently has, loses all the property of estate issues, loses the lift stay issue, loses the recoupment issues, and ends up without having any funds that will get him past the administrative expense level.

The testimony established that the current settlement had an $800,000 subordination, and if the trustee elects not to expend funds to go after greater recovery, that would yield a three to four cent dividend.

The other extreme would be if the trustee wins. If the trustee wins, then all the property of the estate issues would be resolved in the trustee's favor. That was $5.1 million worth of funds. The trustee concedes, however, that there's really no defense to the recoupment issue. So that takes 1.1 out, so that's $4 million. The state has a motion to lift stay on the 900,000. Considering the range of reasonableness and the complexity of the litigation, it's more likely than not that the stay would be lifted and the setoff permitted. The parties have to remember that part of the analysis for lifting the stay is cause, and we have the state court trust funds here to finance nursing homes. Cause would likely exist to have the state setoff the $9000,0000 to have those funds available to aid other residents of other nursing homes.

That leaves 3.1 million. We know roughly 400,000 is covered by Section 503 and 543, that we have the expenses of the custodians here, the state court trustees, and the Bankruptcy Code directs that they get paid by priority, so they get paid. We then have the $1.1 million from HCFA that came in the gap period. Those funds came to the trustees with the anticipation that they would be used to pay ordinary expenses. And the Bankruptcy Code under 502(f) gives gap period ordinary expenses a priority over unsecured creditors.

However parties may analyze the various issue that come up with the use of provider numbers and whether the funds went to the state court trustees over the provider numbers or came directly to the debtor, all of that eventually gets resolved by what actually happened, and here the 1.1 million was advanced by HCFA for ordinary course operating expenses. For purposes of this analysis, the Court has to assume they are going to be treated as a priority under 502(f) and pay back money to HCFA. That means that we're down to 1.6 million.

The trustee says its administrative expenses are bound to be a half a million.

That leaves 1.1 million, and there's no subordination. So we have 1.1 million for unsecured creditors under that scenario without subordination. The settlement has $800,000 for unsecured creditors with subordination. From the point of view of non-government unsecured creditors, with that subordination, the settlement is virtually as good as a win for the trustee since it avoids all the litigation to get there. That is, $8000,0000 for non-government unsecured creditors may be better for them than $1.1 million, with a trustee win, without the subordination.

The settlement is therefore within a range of reasonableness and in the best interest of the bankruptcy estate.

In the whole analysis, I can just take the Karan claim as a wash. If it's good, it's going to get paid. It's either a custodial expense or it's part of the settlement. And if it's not good, it doesn't get paid. But either way, it's a wash. It's either paid or not paid under the settlement or if we proceeded without the settlement.

So the Court will find that the settlement is in the best interest of the estate. It is fair and equitable. It is consistent with the priorities of the Bankruptcy Code, and as a matter of fact, it puts the unsecured creditors in about the best position they could be in, it seems to me. It gets these issues resolved. It has funds with the trustee and it leaves the trustee, the unsecured creditors, HCFA and the state in a position where they are all going to have to make a cost-benefit analysis to figure out how to go about approaching the issues that remain.

Because the approval of a compromise is vested in the discretion of the bankruptcy court, it is appropriate for the bankruptcy court to consider other issues that may impact the estate. And I recognize here that the nursing home resident-care issue has been resolved pre-petition by the actions taken by the State of Texas with the appointment of the trustees and the ac-tions taken by the state trustees and the home operations taken over by others. That could have all fallen into this Court. So when I look at the estate, it's appropriate to think about how the estate would have looked had all those nursing homes and the residents of those nursing homes been part of the bankruptcy estate; and, therefore, it's appropriate for the Court to recognize that HCFA and the State of Texas did coordinate their efforts to make sure that the financial issues did not take priority over the human issues and, in fact, that the human issues were preserved and addressed, and then that the state court trustees and the bankruptcy trustee worked with HCFA and the State of Texas to coordinate all of these matters for an orderly transition to the bankruptcy estate.

The governmental agencies involved are to be complemented for acting in the best public interest and in such a fashion that not only protected the health and well-being of the residents but preserved and recognized the financial issues that are triggered in the bankruptcy case.

And in that regard, the Court would suggest that the parties formulate an outline of the procedure followed prior to the bankruptcy case and that the Court would attach that outline with the settlement to an order approving the settlement and have it reported in the Bankruptcy Reporter so that there is an outline available in the event that this occurs elsewhere. It provides precedent for all the parties involved on how to handle this. Now, I recognize that there is an issue here as to whether what triggered all this and the appropriateness of what triggered all this, and by stating that, I don't mean to suggest that I'm anticipating how any of those issues are going to get resolved. But rather what I'm recognizing is that there can be problems with payments had HCFA acted in the exercise of its discretion that can have an impact on nursing homes, obviously.

We now have a precedent when HCFA so acts, where the nursing home itself is in dire financial condition, for an orderly resolution of the issues that protect both the residents and the rights of the creditors. We will sort through those other creditor rights in due course, but it strikes me that the precedent for how this was handled should be out there and be available without each regional HCFA director and each state attorney general having to figure out how to go about this anew.

So if counsel would prepare that document, I will then clean up this transcript so it reads well, attach it to an order granting the motion and then have the order, the transcript of the bench ruling, the outline of the procedure that was followed pre-petition and the settlement all filed in the Bankruptcy Reporter.

Any other matters we need to take up?

(No response was given.)

THE COURT: Okay. Thank you.

(End of Court's Ruling.)

*CERTIFICATE*

I, DIANE M. DENNIS, Acting Official Court Reporter in and for the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, certify that during the hearing of the above-entitled and numbered cause, I reported in shorthand the proceedings hereinafter set forth, and that the foregoing pages contain a full, true and correct transcript of said proceedings.

GIVEN UNDER MY HAND AND SEAL OF OFFICE on this the 3rd day of August, 1999.

\s\Diane M. Dennis, CSR, RPR
Certified Shorthand Reporter #4347
Acting Official Court Reporter
United States Bankruptcy Court
Northern District of Texas
Dallas Division

Hal F. Morris

State Bar No. 14485410

Edith Stuart Phillips

State Bar No. 15923600

Assistant Attorneys General

Bankruptcy & Collections Division

P.O. Box 12548

Austin, Texas 78711–2548

ATTORNEYS FOR THE TEXAS DEPARTMENT OF HUMAN SERVICES

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

IN RE: SENSITIVE CARE, INC. DEBTOR

CASE NO. 99–31463–SAF–7

(Administratively Consolidated)

Hearing: July 13, 1999
9:30 a.m.

*AGREED ORDER GRANTING JOINT MOTION TO APPROVE COMPROMISE AND SETTLEMENT AGREEMENT PURSUANT TO BANKRUPTCY RULE 9019 BETWEEN THE CHAPTER 7 BANKRUPTCY TRUSTEE, STATE NURSING HOME TRUSTEES, HEALTH CARE FINANCING ADMINISTRATION AND THE TEXAS DEPARTMENT OF HUMAN SERVICES*

On the 21st day of July, 1999, the Court considered the Joint Motion to Approve Compromise and Settlement Agreement (Joint Motion) Pursuant to Bankruptcy Rule 9019 Between the Chapter 7 Bankruptcy Trustee, State Nursing Home Trustees, Health Care Financing Administration ("HCFA") and the Texas Department of Human Services ("DHS").

The Court, having found notice of this Motion to be proper and that all applicable rules of procedure have been complied with, having duly considered the arguments of counsel, having listened to the evidence, and having taken judicial notice of the Court's file in these proceedings, finds that the Joint Motion to Approve Compromise and Settlement Agreement Pursuant to Bankruptcy Rule 9019 Between the Chapter 7 Bankruptcy Trustee, State Nursing Home Trustees, Health Care Financing Administration and the Texas Department of Human Services has merit and is in the best interests of the bankruptcy estate and should therefore be approved.

It is therefore ORDERED:

1. The State Nursing Home Trustees shall transfer all funds in their possession in the estimated amount of $3,267,140.09 to the Chapter 7 Bankruptcy Trustee within ten (10) calendar days of entry of this Order Approving this Joint Motion. Until DHS and TWC have received the sum of $2,058,480 through recoupment, setoff and payments under this settlement, and until HCFA has been paid the sum of $1,097,-973.10 *all funds shall retain their original characteristics as if still in the hands of the State Nursing Home Trustees.* By way of example, but not by limitation, funds segregated by the State Nursing Home Trustees as trust funds, shall not lose their alleged trust fund characteristics simply by transfer to the bankruptcy estate.

2. It is further ORDERED that the Chapter 7 Trustee shall make payment within ten (10) calendar days of receipt of the monies from the State Nursing Home Trustees on ALL invoices for goods and services provided to State Nursing Home Trustees incurred on their watch as administrative expenses approved by the Court and attached to the Order approving the Compromise. The Chapter 7 Trustee reserves the right to object to the payment of any individual bill(s) as either being improperly characterized as an administrative claim (e.g., unreimbursed employee healthcare claim caused by lack of funding of Sensitive Care's self insurance plan) or due to lack of adequate accounting documentation. This Order is without prejudice to the State Nursing home trustees filing subsequent pleading(s) seeking to have additional bills be paid as administrative expenses should late bills come in.

3. It is further ORDERED that the Chapter 7 Trustee shall make payment to the Health Care Financing Administration within ten (10) calendar days of receipt from the State Court Trustees of the sum of $1,097,973.10.

4. It is further ORDERED that relief from the automatic stay shall be granted to the Texas Department of Human Services to allow setoff of $652,011 to DHS for repayment to Nursing Home Trust Fund, plus allowance of setoff of approximately $28,350 additionally owed to The Texas Work Force Commission.

5. It is further the finding of this Court and it is thus ORDERED that DHS is entitled to recoupment of $1,115,130 as supplemental payment/overpayment from DHS out of the sum of $1,795,491 currently held by DHS.

6. It is further ORDERED that the balance of moneys owing to DHS of $262,-989 (which have been traced to payments to State Nursing Home Trustees by State Nursing Home Trust Fund) shall be paid by the Chapter 7 Trustee within ten (10) calendar days of receipt to DHS for balance of its claim of $915,000 owing to Nursing Home Trust Fund for total payment under *this* settlement of approximately $2,058,480.

7. It is further ORDERED that DHS and HCFA shall be allowed to file ANY additional claim(s) against the debtors but

have agreed to voluntarily subordinate such additional claims to:

(a) all allowed administrative claims awarded by court, including payments to Chapter 7 Trustee, his Attorneys, his accountants (and any other professionals retained by the trustee whose fees are allowed by the court as administrative priority),

(b) all allowed priority claims including unreimbursed health care claims of employees of Sensitive Care caused by lack of funding of Sensitive Care's self insurance plan costs, and including payments to the Chapter 7 Trustee,

(c) to distribution of the FIRST Eight–Hundred Thousand Dollars ($800,000) of allowed Unsecured Claims to *non insider*, (as defined under 11 U.S.C. § 101(31)), or *non affiliated entities* of Sensitive Care,

8. It is further ORDERED that the Bankruptcy Trustee shall not be required to file cost reports with HCFA for 1998 and 1999 and that HCFA shall not file a claim in the bankruptcy estate based solely upon the failure of the Bankruptcy Trustee to file such reports. Should the Bankruptcy Trustee file a claim for 1998 or 1999 Medicare monies, HCFA reserves the right to assert any defenses to such claims.

9. It is further ORDERED that the Bankruptcy Trustee *shall file* cost reports for 1998 and 1999 (partial) *as required by DHS* and shall fully cooperate with both DHS and HCFA in their audits.

10. It is further ORDERED that the Bankruptcy Trustee and his counsel shall incur *no* personal liability for completion and filing of any cost reports on behalf of Sensitive Care.

11. DHS further agrees, and it is accordingly SO ORDERED that DHS shall subordinate from any funds it may actually be paid directly by the bankruptcy estate (and not pursuant to recoupment or setoff)

the costs to the estate of compiling and filing Cost Reports at the sole election of DHS for years 1998 and the applicable portion of 1999.

12. It is further ORDERED that nothing herein shall preclude or limit in any way the Bankruptcy Trustee from making claim for Medicare or Medicaid monies that may be subsequently due to Sensitive Care subject to any defenses or claims of offset or recoupment that HCFA or DHS might assert to such claims. By way of example but not by limitation, DHS and HCFA reserve the right to require Sensitive Care to exhaust its administrative remedies prior to any judicial review.

13. It is further ORDERED that nothing herein shall preclude or limit in any way DHS and/or HCFA from effectuating *recoupment* and/or seeking relief from stay to effectuate *setoff* from *any* future Medicaid/Medicare moneys that may subsequently be due to Sensitive Care (by way of example but not by limitation, should the pending change in ownership (CHOW) application for Sensitive Care, Inc.'s' facilities be denied).

14. It is further ORDERED that due to the unique facts and circumstances present in this case, the position of the Texas Department of Human Services and the Health Care Financing Administration in entering into this Compromise and Settlement Agreement shall expressly not be treated as precedential nor shall it ever be cited as precedential against the Texas Department of Human Services or any agency(ies) of the State of Texas or against the Health Care Financing Administration.

SO ORDERED this 3rd day of August, 1999.

\s\Steven A. Felsenthal
STEVEN A. FELSENTHAL
United States Bankruptcy Judge

130

APPROVED AS TO FORM AND CONTENT:

\s\Hal F. Morris
HAL F. MORRIS
Assistant Attorney General
ATTORNEYS FOR THE TEXAS DEPARTMENT OF HUMAN SERVICES
AND THE TEXAS WORKFORCE COMMISSION

\s\Peter A. Winn
PETER A. WINN
Assistant U.S. Attorney
United States Attorney's Office

\s\Andrea Rentie
ANDREA RENTIE
Assistant Regional Counsel
U.S. Department of Health and Human Services

ATTORNEYS FOR HEALTH CARE FINANCING ADMINISTRATION

\s\William Chris Wolffarth
WILLIAM CHRIS WOLFFARTH
Johnson & Wolffarth, L.L.P.
COUNSEL FOR CHAPTER 7 TRUSTEE

\s\———————
DAVID BRAGG
Bragg, Chumley, McQuality & Smithers
ATTORNEY FOR DAVID FRENCH, TRUSTEE

\s\———————
MARK CHOUTEAU
Hilgers & Watkins
ATTORNEY FOR JENNY KING, TRUSTEE

\s\Jeffrey Cook
JEFFREY COOK
Sullivan, Parker & Cook
ATTORNEY FOR WILLIAM ED CAMPBELL AND DON MILLER, TRUSTEES