**In re Vance Cole CHESNUT, Debtor.**

**Vance Cole Chesnut, Plaintiff,**

v.

**Mark T. Brown and Templeton Mortgage Corporation, Defendants.**

**Bankruptcy No. 4–03–41050–DML–13.
Adversary No. 03–4248–DML–13.**

United States Bankruptcy Court, N.D. Texas, Fort Worth Division.

Nov. 6, 2003.

James M. Morrison, Jim Morrison & Associates, PC, Ft. Worth, TX, for Vance Cole Chesnut.

Robert M. Nicoud, Jr., Olson, Nicoud and Gueck, LLP, Dallas, TX, for Mark T. Brown.

### Memorandum Opinion

DENNIS MICHAEL LYNN, Bankruptcy Judge.

Before the court is an adversary proceeding brought by Vance Chesnut ("Chesnut" or "Debtor") against Mark T. Brown ("Brown") and Templeton Mortgage Corporation ("TMC") (collectively, "Defendants"). The adversary proceeding first came before the court on Chesnut's Motion for Sanctions and Contempt (the "Motion") on August 5, 2003. At that time the court heard testimony from Chesnut, Brown and Jerry Corbin ("Corbin"). The parties also introduced into evidence a number of exhibits. Following the hearing, the court carried the Motion until trial on October 14, 2003. Chesnut, Corbin and Jacqueline Chesnut ("Mrs.Chestnut"), Chesnut's wife, testified and Jim Morrison ("Morrison"), Debtor's attorney, proffered his testimony during trial. Additional exhibits were introduced by both sides.

This adversary proceeding is subject to the court's core jurisdiction. 28 U.S.C. §§ 1334 and 157(b)(2)(A), (E) and (O). This memorandum opinion constitutes the court's findings of fact and conclusions of law. FED. R. BANKR.P. 7052.

### I. Background

At issue in this case is whether Defendants violated the automatic stay of 11 U.S.C. § 362(a) [1] by foreclosing on certain property known as 400 I–20 East, Ranger, Texas (the "Property"). The foreclosure occurred on February 4, 2003.[2] Chesnut

---

1. Hereafter, references to Title 11 will be to the "Bankruptcy Code" or "Code."

2. Brown was the owner of the lien foreclosed and TMC was the servicer. Brown controls TMC.

filed for relief under chapter 13 of the Code on January 31, 2003. Defendants take the position that the bankruptcy filing by Chesnut did not prevent the foreclosure because record title to the Property was in Mrs. Chesnut's name as her separate property.

For purposes of this adversary proceeding, the facts are not complicated. Chesnut and Mrs. Chesnut were married in 1996. The Property was acquired in 1999 for cash and a note.[3] The seller of the Property was a third party who later sold the note and lien securing it to Brown.

The deed conveying the Property to Mrs. Chesnut showed it as her separate property. Mrs. Chesnut signed a real estate lien note respecting the Property which also showed it as her separate property. Finally, the title policy reflected the Property as Mrs. Chesnut's separate property.

Chesnut[4] and Mrs. Chesnut both testified, however, that the Property was purchased with community funds.[5] The testimony of each was that Mrs. Chesnut, by herself, attended the closing of the purchase of the Property. Mrs. Chesnut testified that she relied on the seller's counsel to correctly prepare the deed and other paperwork required for the transaction and was not aware that they showed the Property as her separate property.

Though Corbin's memory was hazy—Corbin apparently having unusual difficulty remembering, *inter alia*, names—both Chesnut and Morrison were clear, and exhibits before the court support, that Corbin, who was Defendants' attorney, was repeatedly advised that Chesnut claimed the Property was community property which was part of Chesnut's chapter 13 bankruptcy estate. Defendants relied on Corbin (and bankruptcy counsel) in their decision to foreclose on February 4, despite notice of Chesnut's chapter 13 filing and his assertion of a community interest in the Property.

## II. Task of the Court

### A. *Positions of the Parties*

The parties have focused on the question of whether the Property is separately owned by Mrs. Chesnut or belongs to the community and so is included in Debtor's estate. *See* Bankruptcy Code § 541(a)(2). Debtor argues that separate property is defined in section 3.001 of the Texas Family Code.[6] Because the Property does not fit

---

3. Mrs. Chesnut testified she thought the acquisition was in 1998; the discrepancy is not material, however.

4. Much of Defendants' case at trial consisted of an attack on Chesnut's credibility. As discussed below, Chesnut's lack of credibility is not a viable defense to the allegation that Defendants violated the automatic stay. Chesnut's questionable conduct, however, does play a role in the court's determination of appropriate sanctions. The court also trusts the chapter 13 standing trustee will fully investigate Chesnut's actions. Finally, Chesnut's conduct could be germane in considering a future motion by Defendants for relief from the automatic stay.

5. Chesnut testified that the Property was purchased with "financials" of his business.

Mrs. Chesnut testified that an initial $500 deposit was from money she had saved; however, the $500 was apparently not separate property. At closing, Mrs. Chesnut paid an additional $4,000 in cash she said had been earned by Chesnut's wrecker business. Given the purchase of the Property was three years after the marriage, it is reasonable to suppose the funds used for the purchase were entirely community funds.

6. Section 3.001 provides:

A spouse's separate property consists of:
(1) the property owned or claimed by the spouse before marriage;
(2) the property acquired by the spouse during marriage by gift, devise, or descent; and
(3) the recovery for personal injuries sustained by the spouse during marriage, ex-

in any of the three categories specified in section 3.001, it must be community property, which is defined as "property, other than separate property, acquired by either spouse during marriage." TEX. FAM.CODE ANN. § 3.002 (2003). While the Property might be separate property if it was purchased with Mrs. Chesnut's separate funds,[7] Debtor urges that the evidence shows that the initial (and later) payments were made with community funds. Moreover, Debtor points to section 3.003[8] of Texas Family Code which creates a presumption, rebuttable only by "clear and convincing evidence," that property possessed by one spouse is community property.

To the contrary, Defendants contend that they should be entitled to rely on the deed records, the real estate lien note and the title policy regarding the Property, all of which show it to be Mrs. Chesnut's separate property. Defendants point to section 3.104 of the Texas Family Code[9] which protects third persons dealing with a spouse. Section 3.104 creates a presumption that property held in a spouse's name may be dealt with by the authority of that spouse only. However, section 3.104(b)(2)(B) excludes from the provision's protection a party having "actual or constructive notice of the spouse's lack of authority." Id. § 3.104(b)(2)(B). Actual notice would include the sort of oral and written communications Debtor and Morrison made to Corbin. See BLACK'S LAW DICTIONARY 1061–62(6th ed.1990) (defining "actual notice" as "such notice as is positively proved to have been given to a party

---

cept any recovery for loss of earning capacity during marriage.
TEX. FAM.CODE ANN. § 3.001 (2003).

7. See McPhee v. IRS, No. 3:00–CV–2028–D, 2002 WL 31045978, at *1, 2002 U.S. Dist. LEXIS 17034, at *4 (N.D.Tex. Sept. 10, 2002) (concluding that the community property presumption may be overcome by the party claiming separate property by tracing and identifying the property claimed as separate) (citing Celso v. Celso, 864 S.W.2d 652, 654 (Tex.App.-Tyler 1993, no writ)); Welder v. Welder, 794 S.W.2d 420, 425 (Tex.App.-Corpus Christi 1990, no writ) (finding that presumption of community property is dispelled if spouse can trace and clearly identify the property claimed as separate); Holloway v. Holloway, 671 S.W.2d 51, 60 (Tex.App.-Dallas 1983, writ dism'd) (determining that separate funds are not divested of separate identity when deposited in the same account as community funds when the separate funds may be traced and the trial court is able to determine accurately the interest of each party); McKinley v. McKinley, 496 S.W.2d 540, 543–44 (Tex. 1973) (holding that when separate funds can be traced through a joint account to specific property purchased with those funds, without surmise or speculation about funds withdrawn from the account in the interim, then the property purchased is also separate).

8. Section 3.003 provides:
 (a) Property possessed by either spouse during or on dissolution of marriage is presumed to be community property.
 (b) The degree of proof necessary to establish that property is separate property is clear and convincing evidence.
 TEX. FAM.CODE ANN. § 3.003 (2003).

9. Section 3.104 provides:
 (a) During marriage, property is presumed to be subject to the sole management, control, and disposition of a spouse if it is held in that spouse's name, as shown by muniment, contract, deposit of funds, or other evidence of ownership, or if it is in that spouse's possession and is not subject to such evidence of ownership.
 (b) A third person dealing with a spouse is entitled to rely, as against the other spouse or anyone claiming from that spouse, on that spouse's authority to deal with the property if:
 (1) the property is presumed to be subject to the sole management, control, and disposition of the spouse; and
 (2) the person dealing with the spouse:
 (A) is not a party to a fraud on the other spouse or another person; and
 (B) does not have actual or constructive notice of the spouse's lack of authority.

directly and personally, or such as he is presumed to have received personally because the evidence within his knowledge was sufficient *to put him upon inquiry*") (emphasis added).

Defendants also suggest that the "inception of title" rule—that the character of ownership is established as of the earliest time title can be claimed—protects them. *See* TEX. FAM.CODE ANN. § 3.403. Defendants argue that, because record title reflected separate ownership of the Property by Mrs. Chesnut, ownership was in Mrs. Chesnut at the inception of title. *See id.*

Defendants maintain that Debtor, rather than having a community interest in the Property, has only an "equitable interest" of the sort described in sections 3.401 and 3.402 of the Texas Family Code. Such an interest, however, does not rise to the level of ownership and only "matures on termination of the marriage." [10]

■ The court questions Defendants' reading of the inception of title rule. The inception of title rule is essentially one of timing. [11] Thus, if the inception of title occurs precoverture, the property is separate. If the inception of title occurs during the marriage, the property is community, depending on its source and the intent of the parties. [12] In the case at bar, even if the court were to disbelieve Mrs. Chesnut's testimony that she was not aware the documents at closing showed the Property as her separate property (and Chesnut's off-and-on recognition that the Property was titled to Mrs. Chesnut alone casts a shadow over both his and her testimony regarding their intent at the inception of title), no evidence before the court supports that *Chesnut intended* (as opposed to Mrs. Chesnut) that ownership of the Property would not be of a community character. [13] All the evidence the court has indicates Chesnut was not a party to the closing on the Property and not only furnished the bulk of the funds for the purchase but thereafter dealt with the property as if it belonged to the community.

■ As for caselaw to the effect that specific recitals in the deed overcome the presumption that property is community

---

*Id.* § 3.104.

10. Section 3.404 provides:
 (a) This subchapter does not affect the rule of inception of title under which the character of property is determined at the time the right to own or claim the property arises.
 (b) The claim for economic contribution created under this subchapter does not create an ownership interest in property, but does create a claim against the property of the benefited estate by the contributing estate. The claim matures on dissolution of the marriage or the death of either spouse.
 *Id.* § 3.404.

11. *See, e.g., Winkle v. Winkle*, 951 S.W.2d 80, 89 (Tex.App.-Corpus Christi 1997, *reh'g denied*); *Welder*, 794 S.W.2d at 427; *Saldana v. Saldana*, 791 S.W.2d 316, 319 (Tex.App.-Corpus Christi 1990, no writ); *Carter v. Carter*, 736 S.W.2d 775, 779 (Tex.App.-Houston [14th Dist.] 1987, no writ).

12. *See Welder*, 794 S.W.2d at 427 (finding that the major consideration in determining the characterization of property as community or separate is the intention of the spouses as shown by the circumstances surrounding the inception of title); *Holloway*, 671 S.W.2d at 56–57 (concluding that jury instruction which suggested the unilateral intention of the husband was controlling in determining the separate nature of funds borrowed, and of the ranch thereby acquired, was clearly a misstatement of the law).

13. Section 3.004 of the Texas Family Code allows for recordation of a schedule of separate property. If a schedule of real property is to be recorded as separate property, it must be acknowledged by both spouses. *See* 15 TEXAS FORMS LEGAL & BUS. §§ 32.47 and 32.41 (2002). Although Defendants had sufficient oral and written actual notice to put them on inquiry, Defendants made *no search of the* records for such a schedule.

in character and create a contrary presumption,[14] that presumption as well "may be, of course, overcome by contradicting evidence."[15] In the case at bar, there was ample evidence for a fact finder to conclude that the ownership was not as recited in the recorded documents. Defendants were also clearly on notice of Chesnut's claim that the Property was of community character.

### B. The Court's Task

It is not at this time the chore of the court to determine whether the Property was a community asset or separately owned by Mrs. Chesnut. The court need only decide whether Debtor had an interest in the Property which was protected by the automatic stay. If Debtor had rights respecting the Property which were adversely affected by Defendants' foreclosure, a violation of the stay occurred.

### III. Discussion

■ The court's determination of this matter may be broken down into two parts. First, the court will explain its conclusion that Defendants willfully violated the automatic stay. Second, it will address the sanctions to be imposed on Defendants.

### A. Defendants Violated the Stay

■ The automatic stay of section 362 of the Code is extremely broad and is intended to protect the debtor from creditor actions against all property of the estate. *Value Recovery Group, Inc. v. Hourani,* 115 F.Supp.2d 761, 767 (S.D.Tex. 2000) (agreeing that the scope of section 362 is broad because the purpose of the stay is to provide the debtor breathing room); *Bartucci v. O'Neil,* 64 Fed.Appx. 344, 345 (3rd Cir.2003) (concluding that the scope of the automatic stay is broad and automatically stays judicial actions against a debtor); *Bamburg v. Townsend,* 35 S.W.3d 85, 88–90 (Tex.App.-Texarkana 2000, no pet. h.) (finding that the automatic stay is "purposely broad" and stops all collection efforts, harassment, and foreclosure actions "for the benefit of the debtor").

■ The scope of the estate created under section 541 of the Code by the filing of a bankruptcy petition is also of maximum breadth. *In re Sensitive Care, Inc.,* 239 B.R. 117, 124 (Bankr.N.D.Tex.1999) (stating that section 541 is "very broad"); *Equinox Oil Co., Inc. v. Anthill Constr. Co. (In re Equinox Oil Co., Inc.),* No. 00–3320, 2001 WL 649806, at *2, 2001 U.S. Dist. LEXIS 8165, at *14 (E.D. La. June 11, 2001) (finding that the scope of section 541 is broad and includes all kinds of tangible or intangible property and clearly encompasses the proceeds of the disputed indemnification insurance policy at issue); *Foust v. Seal (In re Foust),* No. 98–50774, 2000 WL 33769159, at *3, 2000 Bankr.LEXIS 1146, at *7 (Bankr. S.D.Miss. July 18, 2000) (finding that the scope of section 541 "is broad and extends even to property seized prior to commencement of the bankruptcy proceeding") (citing *Ga. Pac. Corp. v. Sigma Serv. Corp.,* 712 F.2d 962, 966 (5th Cir.1983)); *In re Milit, Inc.,* 231 B.R. 604, 606 (Bankr. W.D.Tex.1999) (opining that "[i]n something of an understatement, courts have described the scope of [section 541] as 'broad.' ").

■ Whether something is property of the estate depends solely on whether an interest in that property exists under applicable nonbankruptcy law. *McCloy v.*

**14.** *Teas v. Republic Nat'l Bank,* 460 S.W.2d 233, 243 (Tex. App.-Dallas 1970, writ ref'd n.r.e.).

**15.** *Id.* at 244.

*Silverthorne (In re McCloy)*, No. 2:01–CV–215, 2001 WL 1338806, at *5, 2001 U.S. Dist. LEXIS 16805, at *13 (N.D.Tex. Oct. 17, 2001) (finding that "[d]etermination of whether the debtor has an interest in property is made under nonbankruptcy law"); 5 COLLIER ON BANKRUPTCY ¶ 541.05 (15th ed. rev.2003) (discussing that disposition of whether debtor has an interest in property in the first instance must be resolved by reference to nonbankruptcy law).

■ In the case at bar, the law of Texas determines whether Debtor had an interest in the Property. As admitted even by Defendants, Debtor had, at a minimum, an equitable interest in the Property. Furthermore, whether the Property belongs to the community and so is property of the estate is dependent on various facts. Therein lies the problem with Defendants' arguments. At best, from Defendants' perspective, the Property is *presumed* to be separately owned by Mrs. Chesnut. *See Teas*, 460 S.W.2d at 243. At worst, the Property is *presumed* to be community property. *See* TEXAS FAMILY CODE ANN. § 3.003. In either case, whether the Property is part of Debtor's estate is a question of fact which must be adjudicated by a court. Debtor unquestionably has a viable claim that the Property was properly includible in his estate.

Once Defendants were on notice of Debtor's claim that the Property was community owned, Defendants should have recognized that the automatic stay prevented them from foreclosing on the Property. It was not Defendants' place to *assume* that a court would later determine Debtor's claim invalid. The automatic stay was meant to protect Debtor's claim of estate ownership of the Property. The automatic stay, therefore, prevented Defendants from extinguishing that claim by foreclosure.

■ That Chesnut is subject to attack on the basis of his credibility is irrelevant.

Defendants only learned of Chesnut's dubious value as a witness *after* foreclosure. Besides, the effect of Chesnut's credibility in a determination of the facts respecting ownership of the Property is the province of a court. It is not up to a party exercising a self-help remedy to determine, to the preclusion of this court, what is or is not property of the estate.

Nor were Defendants without a remedy. Section 362(f) of the Code gave Defendants an opportunity to seek relief from the automatic stay between Debtor's filing on January 31, 2003, and the February 4, 2003, date of foreclosure. Yet, despite notice of Debtor's claims prepetition and thereafter, Defendants never approached this court for prospective or even retrospective relief from the stay but, rather, sat on their hands until Debtor brought this adversary proceeding.

■ Clearly, the stay was violated by Defendants. Clearly, by Corbin's own testimony, Defendants' foreclosure on the Property was carefully thought through and was, therefore, willful. *See In Re San Angelo Pro Hockey Club, Inc.*, 292 B.R. 118, 126 (Bankr.N.D.Tex.2003) (finding that a willful violation of the automatic stay occurs when the defendant knew of the automatic stay and defendant's actions which violated the stay were intentional); *In re Freemyer Indus. Pressure, Inc.*, 281 B.R. 262, 267 (Bankr.N.D.Tex.2002) (finding that debtor's failure to meet the burden of inquiry, *i.e.*, to seek further information as to whether the automatic stay was applicable, resulted in a willful violation of section 362); *In re Meinke, Peterson & Damer, P.C.*, 44 B.R. 105, 108 (Bankr.N.D.Tex.1984) (determining that a "willful violation of the automatic stay is committed when the contemnor acts with knowledge of the filing of the bankruptcy petition"). That Defendants acted on the advice of counsel does not alter this conclusion. Counsel's error is between counsel

and Defendants. It does not provide Defendants with an excuse for their violation of the law. *See Stinson v. Bi–Rite Rest. Supply, Inc. (In re Stinson)*, 295 B.R. 109, 118 (9th Cir. BAP 2003) (finding that if a creditor knew of the automatic stay and intentionally performed actions which violated the stay, neither a good faith belief that the creditor had a right to the property nor a good faith reliance on the advice of counsel is relevant); *SEC v. Alliance Leasing Corp.*, 28 Fed.Appx. 648, 652 (9th Cir.2002) (finding that a good faith reliance on advice of counsel is not a defense to allegations of scienter); *Official Unsecured Creditors' Comm. of Gen. Homes Corp. v. Am. Sav. & Loan Ass'n of Fla. (In re Gen. Homes Corp. and FGMC, Inc.)*, 181 B.R. 870, 876 (Bankr.S.D.Tex. 1994) (concluding that "[w]here a violation of the automatic stay is the result of wilful conduct, even if on the advice of counsel, contempt is an appropriate remedy"); *In re Meinke, Peterson & Damer, P.C.*, 44 B.R. at 108 (determining that a "violation of the automatic stay of Section 362 may be willful even if it occurred on the advice of counsel").

 The court cannot end this discussion without noting that its conclusion that a viable claim is protected by the automatic stay is not an invitation to debtors to make frivolous and baseless claims of ownership to property. Not only would such claims most likely be summarily disposed of, with little delay or inconvenience to a stayed creditor,[16] such an abuse of the stay would subject the debtor—and possibly debtor's counsel—to the most severe sanctions.

## B. Sanctions

 Having determined that Defendants violated the automatic stay, the court must turn to Debtor's prayer for sanctions. Debtor asks the court not only to force return of the Property but also to award Debtor damages, including attorney's fees. Section 362(h) of the Code[17] provides for the award of actual damages and attorneys' fees, and permits, in appropriate circumstances, punitive damages payable to an individual (here Debtor) harmed by a stay violation. In determining sanctions—which need not necessarily equate to damages payable to Debtor—the court must also consider the deterrent effect of its determination. *See In re Steenstra*, 280 B.R. 560, 569 (Bankr. D.Mass.2002) (finding that "[p]unitive damages for violation of the automatic stay are often awarded as a deterrent to prevent similar future acts"); *In re Dunning*, 269 B.R. 357, 363 (Bankr.N.D.Ohio 2001) (explaining that the deterrent effect of the damages remedy of section 362(h) is not limited to violators who had specific intent); *Fed.Home Loan Mortgage Corp.*, No. 96–81–SD, 1996 U.S. Dist. LEXIS 22663, at *19 (D.N.H. Aug.29, 1996) (concluding that punitive damages are awarded for both punitive and deterrent purposes) (citing *In re Sumpter*, 171 B.R. 835, 845 (Bankr.N.D.Ill.1994)).

It is at this point in the court's analysis that the evidence introduced by Defen-

---

16. The court need not determine here if, or at what point, a claim by a debtor could be so transparently baseless so as to allow a creditor to act without fear of violating the stay. Suffice it to say this is not that case—and it is always wise for a party contemplating action which might be stayed to err on the side of caution. *See generally* 3 COLLIER ON BANKRTUPTCY ¶ 362.02 (15th ed. rev.2003) (warning that if a party has doubts, it is incumbent upon that party to determine, before acting, whether the stay applies).

17. Section 362(h) provides:

An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

dants to impeach Chesnut's credibility becomes relevant. Though the court does not consider Chesnut's veracity as a witness a necessary element in deciding whether he had a viable claim that the Property belonged to the community, the logical inference from Defendants' impeachment evidence is that Chesnut has abused the bankruptcy system.

The instant chapter 13 case is Chesnut's second, his prior chapter 13 case having been filed in 1997 and closed only weeks before the current case was commenced. During the prior case, the Property was acquired as was another small piece of real estate. Pursuant to section 1306 of the Code, these acquisitions became property of the estate if they were owned by the community.[18] Moreover, the ability of Chesnut to underwrite the acquisitions suggests his disposable income was greater than anticipated. Because unsecured creditors were not paid in full in Chesnut's first bankruptcy and because the Property was paid for from funds earned within the first three years of the pendency of the case, Chesnut's plan presumably should not have been confirmed under section 1325(b)(1) of the Code.

█ Though it does not appear that Chesnut had an affirmative obligation to inform the chapter 13 standing trustee of the availability of new funds or assets which would allow modification of his plan,[19] causing title to the Property to be put in Mrs. Chesnut's name, together with Chesnut's testimony as to why he did not tell Defendants (in connection with earlier defaults) that the Property was part of the estate in his prior chapter 13 case, suggests Chesnut may have intended to conceal acquisition of the Property from his trustee and creditors. Considering this together with omission of another piece of property and other errors in the schedules filed in the instant case, as well as testimony by Chesnut about his residence from which may be inferred an effort to misuse the Texas homestead exemption, the court finds that Chesnut comes before it with unclean hands.[20] The court may consider such circumstances in fashioning any sanction against Defendants. The court also will consider Defendants' efforts in bringing Chesnut's questionable conduct to the court's attention.

Because Defendants' willful violation of the stay forced Chesnut to resort to this court to enforce his rights under the automatic stay, this court nevertheless finds that damages and attorney's fees are appropriate. *See Shriver v. Tingley (In re Shriver)*, 46 B.R. 626, 631 (Bankr.

---

18. Rule 1007(h) of the Federal Rules of Bankruptcy Procedure provides the only *requirement* for amending schedules to show after-acquired property. Rule 1007(h) applies only to property added to the estate under section 541(a)(5), *i.e.*, property acquired through bequest, devise, inheritance, or property settlement in insurance. The Property does not fall *within any of these categories (though it clearly is within the ambit of section 1306)*.

19. Though sections 1325(b)(1) and 1329 of the Code must be invoked by an unsecured creditor or the trustee, it is probable that the trustee would have required an amendment to Chesnut's plan had he known of the extra available money.

20. Under the doctrine of unclean hands, a "court may refuse to grant equitable relief to a plaintiff who has been guilty of unlawful or inequitable conduct." *Randall & Blake, Inc. v. Evans (In re Canion)*, 196 F.3d 579, 586 (5th Cir.1999) (citing *Lazy M Ranch, Ltd. v. TXI Operations, LP*, 978 S.W.2d 678, 683 (Tex. App.-Austin 1998, pet denied)). *See also Schenck v. Halliday Real Estate, Inc.*, 803 S.W.2d 361, 366 (Tex.App.-Fort Worth 1990, no writ) (agreeing that it is well settled that a party seeking equity cannot come into a court with unclean hands).

N.D.Ohio 1985) (finding that an award of attorneys' fees is appropriate when debtor has been forced to come into court to enforce rights provided under the Code or return debtor to the status quo); *In re Conti,* 42 B.R. 122, 128 (Bankr.E.D.Va. 1984) (finding that failure to compensate debtor for legal expenses to enforce rights provided under the Bankruptcy Code would be inequitable).

Accordingly, the court believes an appropriate sanction to impose on Defendants in this case is $10,000, after reduction for the value of Defendants' work. The sanction of $10,000 shall be paid to the registry of this court to be disbursed as hereafter described.[21]

Morrison shall have 30 days from the date of this opinion to file a complete application for compensation. Alternatively, if Morrison files no such application, Morrison shall be paid $5,000 as attorney's fees in this matter from the $10,000 assessed against Defendants and held by the clerk.

A copy of this opinion shall be served on the standing chapter 13 trustee, who shall have 30 days from the date hereof to seek funds on hand with the clerk pursuant to this ruling in order to satisfy unsecured claims in Chesnut's first (1997) chapter 13 case.[22] Any funds thereafter remaining from the amount paid in by Defendants shall be forfeit to the United States as a fine.

### IV. Conclusion

As Defendants foreclosed on the Property in violation of the stay, the Property must be reconveyed by Defendants to Mrs. Chesnut. *See In re Robinson,* No. 00–B–02122, 2000 WL 1800604, at *1, 2000 Bankr.LEXIS 1433, at *2–3 (Bankr. N.D.Ill.Dec.7, 2000) (holding that an action found to violate the automatic stay will be considered void *ab initio*) (citing *Martino v. First Nat'l Bank of Harvey (In re Garofalo's Finer Foods, Inc.),* 186 B.R. 414, 436 (N.D.Ill.1995)). Following payment of the $10,000 sanction described above, Defendants may seek relief from the automatic stay as to the Property.

Counsel for Debtor is directed to prepare a judgment consistent with this opinion.

---

21. Because Chesnut is before the court with unclean hands and his own conduct contributed to the resulting violation of the stay, Chesnut is entitled to receive no part of this sum. *See Shondel v. McDermott,* 775 F.2d 859, 867–68 (7th Cir.1985) (explaining that "unclean hands really just means that in equity as in law the plaintiff's fault, like the defendant's, is relevant to the question of what if any remedy the plaintiff is entitled to. An obviously sensible application of this principle is to withhold an equitable remedy that would encourage or reward illegal activity").

22. The court does not here decide whether the chapter 13 trustee could reach those funds and pay them to creditors.